**MOUNTAIN SOLUTIONS, INC., et al., Plaintiffs,**

v.

**STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, et al., Defendants.**

**Civil Action No. 97–2116–GTV.**

United States District Court, D. Kansas.

May 23, 1997.

Mark P. Johnson, Jan P. Helder, Jr., Lisa C. Creighton, Sonnenschein, Nath & Rosenthal, Kansas City, MO, for Mountain Solutions, Inc., Sprint Spectrum, L.P., Liberty Cellular, Inc., Mercury Cellular of Kansas, Western Wireless Corporation, DCC PCS, Inc., Dobson Cellular of Kansas/Missouri, Inc.

Marc E. Elkins, Morrison & Heckler, L.L.P., Kansas City, MO, Mark P. Johnson, Sonnenschein, Nath & Rosenthal, Kansas City, MO, for Topeka Cellular Telephone, Airtouch Cellular of Kansas, CMT Partners.

Eva Powers, Stephen H. Kukta, Kansas Corporation Commission, Topeka, KS, for State Corporation Commission of State of Kansas, National Exchange Carrier Association, Inc., Commissioner of the State Corporation Commission of the State of Kansas, Timothy E. McKee, Commissioner of the State Corporation Commission of the State of Kansas, Susan M. Seltsam, Commissioner of the State Corporation Commission of the State of Kansas, John Wine.

Michael C. Cavell, William R. Drexel, Southwestern Bell Telephone Co., Topeka, KS, Michael D. Moeller, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Southwestern Bell Telephone Company.

James M. Caplinger, Mark E. Caplinger, James M. Caplinger, Jr., James M. Caplinger, Chtd., Topeka, KS, for Inventors–Defendants.

Victor A. Davis, Jr., Weary, Davis, Henry, Struebing & Troup, Junction City, KS, for Kansas Cable Telecommunications Association, Inc.

### MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

Plaintiffs bring this action seeking an injunction prohibiting defendants from requiring commercial mobile service providers in Kansas to contribute to the Kansas Universal Service Fund. The case comes before the court on plaintiffs' motion for a preliminary injunction (Doc. 3).[1] For the reasons set forth below, plaintiffs' motion is denied.

---

1. All parties and intervenors agree that there are no controverted facts in this case and urge the court to rule on plaintiffs' applications for preliminary and permanent injunctive relief simulta-

## I. Background

On April 4, 1996, in response to a legislative mandate under the Kansas Telecommunications Act of 1996, K.S.A. § 66–2001 *et seq.*, the Kansas Corporation Commission ("KCC") established the Kansas Universal Service Fund ("KUSF"). The purpose of the KUSF is to ensure that rural telephone customers, who often are affected adversely by rate rebalancing, continue to enjoy affordable intrastate telecommunications services. By administering the collection and distribution of universal service support payments, the KUSF is able, in theory, to guarantee "that every Kansan will have access to a first class telecommunications infrastructure that provides excellent services at an affordable price." K.S.A. § 66–2001(a).

The KUSF compensates independent local exchange carriers for the revenues lost as a result of the state-imposed mandatory reductions in intrastate access charges.[2] *See id.* §§ 66–2005(c) & 66–2008(a). In this manner, customers enjoy reduced intra-state long-distance rates (albeit offset somewhat with possible increased local service rates) while local exchange carriers minimize the financial setback that rate rebalancing creates.

The specific statute governing KUSF funding states that "every telecommunications carrier, telecommunications public utility and wireless telecommunications service provider that provides intrastate telecommunications services" in Kansas must contribute to the fund on an equitable basis. K.S.A. § 66–2008(b). Acting pursuant to this statute, the KCC issued an order directing, *inter alia*, all wireless communications providers,[3] which are also known as commercial mobile service providers, to contribute a percentage of their retail revenue to the KUSF each month. *See In the Matter of a General Investigation Into Competition within the Telecommunications Industry in the State of Kansas*, No.

190,492–U at ¶¶ 109–110 (Dec. 27, 1996). The KCC further held that the contribution requirement was not inconsistent with any federal law. *Id.* at ¶ 187.

A group of telecommunications industry associations and commercial mobile service providers, five of whom are plaintiffs in this action, subsequently filed a petition for reconsideration of the KCC's December 27, 1996 order. On February 3, 1997, the KCC denied the reconsideration request. Those entities then appealed the KCC's order to the Kansas Court of Appeals, where the matter is now pending.

In the case at bar, ten commercial mobile service providers have brought suit against the KCC, the KCC Commissioners, and the National Exchange Carrier Association, which administers the KUSF, claiming that K.S.A. § 66–2008(b) is preempted by 47 U.S.C. § 332(c)(3)(A). Plaintiffs contend, therefore, that the KCC's order enforcing section 66–2008(b) contravenes the Constitution's Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, and must be enjoined. Defendants dispute any preemption issue and insist that the Kansas statute and corresponding KCC order are specifically authorized by 47 U.S.C. § 254(f).

## II. Discussion

### A. Abstention

Before addressing plaintiffs' request for injunctive relief, the court first must determine whether it should entertain this lawsuit in the first place. Although no party or intervenor has raised the issue, the specter of the abstention doctrine looms about the court.

Federal courts have a general obligation to exercise the jurisdiction that Congress grants them. *Seneca–Cayuga Tribe v. State of Oklahoma*, 874 F.2d 709, 711 (10th Cir.

---

neously. No motion for partial summary judgment, however, has been filed with respect to the permanent injunction. As soon as such a motion is filed, the court will grant it for the same reasons identified in this Memorandum and Order.

2. "Access charges" refer to the fees charged by independent local exchange carriers to long-dis-

tance companies for use of the carriers' telephone network.

3. Wireless communications providers include companies that use cellular technology as well as companies that use "personal communications services" (PCS) technology.

1989). "As courts within a federalist system, however, they are on rare occasions permitted or required not to exercise their jurisdiction where such inaction is necessary to avoid undue interference with states' conduct of their own affairs." *Id.* The decision whether to abstain from interfering with a state judicial proceeding is governed by the principles set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny.

■ *Younger* abstention requires three elements: (1) an ongoing judicial (or, in a proper case, administrative proceeding); (2) the presence of an important state interest; and (3) an adequate opportunity to raise federal claims in the state proceeding. *Seneca–Cayuga Tribe,* 874 F.2d at 711. Although the KCC's order mandating KUSF contributions from commercial mobile service providers is presently before the Kansas Court of Appeals, all parties and intervenors in the case at bar have indicated that no preemption issues are raised in that appeal. This contention is disingenuous. At least one of the plaintiffs in this action, CMT Partners, explicitly raised the preemption issue in its state court appellate brief. Moreover, the Supreme Court has made clear that state courts are "presumed competent to resolve federal issues." *Chick Kam Choo v. Exxon Corp.,* 486 U.S. 140, 150, 108 S.Ct. 1684, 1691, 100 L.Ed.2d 127 (1988).

■ Nevertheless, there is an exception to the *Younger* abstention doctrine. If a federal court is confronted with "facially conclusive claims of federal preemption," the court need not abstain, but instead, may decide the preemption question. *GTE Mobilnet of Ohio v. Johnson,* 111 F.3d 469, 475 & 476–77 (6th Cir.1997) (citing *Bunning v. Commonwealth of Ky.,* 42 F.3d 1008 (6th Cir.1994) and *Norfolk & W. Ry. Co. v. Public Utils. Comm'n,* 926 F.2d 567 (6th Cir.1991)). As the discussion in Part B.2. of this opinion demonstrates, such a situation is presented here. Accordingly, the court finds it appropriate to rule on the merits of plaintiffs' claims.

### B. Preliminary Injunction

Preliminary injunctive relief may be granted only if the moving party can establish that: (1) the movant will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the movant will eventually prevail on the merits. *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social and Rehabilitation Servs.,* 31 F.3d 1536, 1542 (10th Cir.1994). The court will confine its analysis to the first and fourth prongs of the preliminary injunction test.

### 1. Irreparable Harm

■ Plaintiffs (and the commercial mobile service provider intervenors) contend that they will suffer irreparable harm if an injunction does not issue because they will be forced to pass on the costs of their KUSF contributions to their customers. They argue that the concomitant increase in cost of commercial mobile service will diminish their customer base. The court rejects this claim.

First, the decision to pass on KUSF contribution costs to customers is a business judgment beyond the purview of the court. If commercial mobile service providers are concerned that a rise in monthly billings will drive away customers, those companies are free to assume some or all of the costs themselves. All telecommunications providers in Kansas are subject to the same assessment (on an equitable basis) and face identical economic considerations. Plaintiffs are not in a unique situation and it would be inappropriate for the court to put them in a competitively advantageous position by excusing their contribution obligations.

Second, if through judicial decree or legislative enactment, commercial mobile service providers are held to be exempt from the mandatory contribution requirement, their payments into the KUSF may be recovered. At the May 19, 1997 hearing, the KCC's counsel advised the court that the KCC has the authority to increase the assessments of other telecommunications providers in order to provide a vehicle by which plaintiffs may recoup any overpayments. Moreover, while

the Eleventh Amendment may preclude a recovery action against the KCC in federal court, nothing would prevent plaintiffs from bringing such a case in state court. In short, plaintiffs have failed to establish that they will suffer irreparable harm without the issuance of an injunction.

### 2. Likelihood of Success on Merits

Plaintiffs also have failed to show that they are likely to prevail on the merits. The controversy here centers around a purported conflict between two provisions of the Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.* Specifically, the issue is whether 47 U.S.C. § 332(c)(3)(A) serves as exception to 47 U.S.C. § 254(f). The court begins its analysis by looking to the specific language of the two statutes.

Section 254(f), enacted by Congress as part of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 71, provides:

A State may adopt regulations not inconsistent with the [Federal Communications] Commissions's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

47 U.S.C. § 254(f). A "telecommunications carrier" is defined as any non-aggregator provider of telecommunications services. *Id.* § 153(44). "Telecommunications services" refers to "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." *Id.* § 153(46).

Section 332(c)(3)(A), adopted pursuant to the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, 107 Stat. 393, provides in pertinent part:

[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this paragraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates.

47 U.S.C. § 332(c)(3)(A).

Plaintiffs insist that, despite the broad authorization granted to states in section 254(f), section 332(c)(3)(A) must be read to prohibit the imposition of mandatory contribution requirements upon mobile service providers. In support of this contention, plaintiffs highlight the parenthetical language in the second sentence of section 332(c)(3)(A). Plaintiffs claim that only if commercial mobile services are a substitute for land line telephone exchange service, which it is uncontroverted they are not in Kansas, may a state seek contributions to a universal fund from wireless telecommunications providers. The court disagrees.

In interpreting statutes, courts must not be guided by a single sentence or portion of a sentence, but must look to the provisions of the whole law, and to its object and policy. *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 357–58, 93 L.Ed.2d 216 (1986). Moreover, whenever possible, statutes should be read to foster harmony rather than conflict with each other. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018, 104 S.Ct. 2862, 2880–81, 81 L.Ed.2d 815 (1984); *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.,* 58 F.3d 1498, 1507 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996).

Although the statutes hardly represent the acme of legislative drafting, the court finds no conflict between 47 U.S.C. §§ 254(f) and 332(c)(3)(A). Contrary to plaintiffs' assertion, the second sentence of section 332(c)(3)(A) serves as an exception, not to section 254(f), but to the first sentence of section 332(c)(3)(A). In other words, Congress appears to have intended that states generally are prohibited from regulating the rates or market entry of commercial mobile service providers; however, regulation of rates and market entry is permissible if commercial mobile services are a substitute for land line telephone exchange service in the majority of the state. The universal service language contained in the second sentence of section 332(c)(3)(A) merely clarifies that states wishing to ensure the universal availability of affordable telecommunications services may regulate the *rates and market entry* of commercial mobile service providers if certain preconditions are satisfied. Nothing in that sentence indicates any intent to prevent states from attempting to guarantee universal availability of telecommunications services through means other than *rate or market entry regulation*.[4]

The mandatory KUSF contributions that the KCC has imposed on all telecommunications providers in the state do not constitute a regulation of rates or market entry. The assessments simply constitute an additional cost of doing business that the companies either may absorb themselves or pass on to their customers. Plaintiffs seem to suggest that because the KCC's directive may force many commercial mobile service providers to raise their rates, the directive is equivalent to a rate regulation. Such a broad interpretation, however, would have the effect of gutting nearly all regulatory authority over wireless telecommunications providers, a result that Congress did not envision.

The preemptive reach of 47 U.S.C. § 332(c)(3)(A) is limited on its face. The statute prohibits states from regulating rates and market entry, but specifically authorizes them to regulate "other terms and conditions" of service. The legislative history of the statute indicates that Congress did not intend to remove all state regulatory authority:

> It is the intent of the Committee that the states still would be able to regulate the terms and conditions of these services. By "terms and conditions," the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (e.g. zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or such other matters as fall within a state's lawful authority. This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under "terms and conditions."

H.R.Rep. No. 103–111, at 261 (1993) *reprinted in* 1993 U.S.C.C.A.N. 378, 588. Complying with these "terms and conditions" necessarily entails the expending of significant financial capital. Unless the commercial service providers opt to assume the entire costs themselves, rates will go up as costs are passed on to customers. The court sees no functional difference between the "terms and conditions" outlined in the House report and the KUSF contributions at issue here.

Furthermore, the federal Telecommunications Act of 1996 expressly authorizes states to collect mandatory contributions from all intrastate telecommunications service providers for the purpose of preserving and advancing universal service. See 47 U.S.C. § 254(f). Plaintiffs attempt to minimize the effect of this statute by arguing that it is a general provision that does not disturb the regulatory prohibition on commercial mobile service set out in 47 U.S.C. § 332(c)(3)(A). *See Franklin v. United States,* 992 F.2d 1492, 1502 (10th Cir.1993) ("[R]egardless of priority of enactment, a specific statute ... should not be deemed controlled or nullified by a general statute, ... absent a definite contrary intention."). Defendants respond by contending that section 254(f) is a specific statute dealing with universal service where-

---

4. In reaching this conclusion, the court rejects the "redundancy" interpretation of *Metro Mobile Cts of Fairfield County. Inc. v. Department of Pub. Util. Control,* Nos. CV950051275S &

CV950550096S, 1996 WL 737480 (Conn.Super.Ct. Dec.11, 1996), which plaintiffs cite in support of their position.

as section 332(c)(3)(A) is merely a general statute on commercial service providers. The court need not enter the fray because, as noted earlier, it finds no irreconcilable inconsistency between the two statutes. The court's "task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 1122–23, 122 L.Ed.2d 457 (1993).

### III.  Conclusion

The court finds that 47 U.S.C. §§ 254(f) and 332(c)(3)(A) exist in harmony and do not conflict with each other.  K.S.A. § 66–2008(b), adopted in conformity with 47 U.S.C. § 254(f), must be construed, therefore, as consistent with federal law.  Accordingly, the court concludes that the KCC order requiring all commercial mobile service providers in the state to contribute to the KUSF is not preempted by federal law.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiffs' motion for a preliminary injunction (Doc. 3) is denied.

Copies of this order shall be mailed to counsel of record for the parties and intervenors.

**IT IS SO ORDERED.**